Good morning, your honors. May it please the court, my name is Thomas Blue. I represent the appellants. Good morning, your honors. Brad Phillips on behalf of defendants and respondents. Thank you. May it please the court. It's been a little bit since I said this, so I'll say it just one more time for you, and that is you're going to have to reserve your own time if you want some for rebuttal. Understood, your honor. Thank you. I get to actually apprise the court of something that's not in the brief, the reason why this case was brought, the significance of the case, and perspective. One would wonder why this case hasn't been brought before and why there are no appellate decisions on tying involving credit card processing. Well, until the Walmart case was brought, no one had really thought of it. The issue was for gas station dealers years ago when gas prices were cheap, they were a dollar or less, the credit card fee was a negligible, inconvenient expense of doing business. As the mergers occurred and the run-up in gas prices has occurred, the gross percentage of sales has increased the fees as an expense, which is actually crippling gas station dealers at this point. And Equilon is actively involved in keeping that price high. Now, Equilon argues that there are no tying cases left. This law is antiquated, it's defunct, that is not the case. As recently as the last year, year and a half, the court in Illinois tool said that in tying cases, the Supreme Court in Illinois tool said tying cases are not entitled to a presumption of market power. So we have to reconcile what the court said. Now, we understand what that means, but that does not mean that tying arrangements are dead. Counsel, let's kind of help me here. What do you think are the two products? The two products are branded retail petroleum franchises, which Equilon Shell Motiva is the number one petroleum franchisor in the country. And the separate product is credit and debit card processing services, which have nothing to do with the Shell and Texaco trademarks that can be provided by credit card processing firms outside of Equilon's network. That's a separate product. And under the credit card cases, the MasterCard, NRA MasterCard, NRA Visa MasterCard cases, the Walmart versus Visa cases, those courts have actually held that even debit card processing is separate and a distinct product from credit card processing. Let me ask this. What do you plead in your complaint as to the share of the market that they have as to the franchisees? I actually plead in the complaint that they're number one. I plead in the complaint. That doesn't do it. Well, they're at 13 percent, Your Honor. I actually, I think I plead in the complaint in the common allegations part, paragraph 19 to 38. Is 13 percent enough to do it? Yes, Your Honor. Jefferson Parish says there is no bright line what constitutes market power. Northern Pacific says there is no bright line what constitutes efficient market power. Jefferson Parish is completely misconstrued by Equilon in this case because Jefferson Parish dealt with a single hospital. Let's put things in perspective. A single hospital in an area that had over 20 hospitals, it did not deal with a major oil company that has vast resources to control the branded petroleum franchise network in the United States. And what we can't do is we can't ignore the case law. And defense wants to talk about the Leakin case. There's a classic line in the Leakin case that says a per se rule is appropriate after courts have considerable experience with the type of restraint at issue. The question I have for this court, which Judge Reel did not answer, please explain to me why all of the cases involving tires, batteries, and accessories that are all cited in my brief, the Lessig v. Tidewater, Standard Oil v. U.S., Davis v. Marathon, Shelt Oil Company v. FTC, why are those cases not applicable to this case? One could argue that tires and batteries and accessories are more a part of a gasoline service station franchise than credit card processing. Let me ask you a second question, which will kind of help with Judge Fletcher's question. You say the market they're in is the franchise market. What's the market for credit card servicing and a credit card servicing arrangement? Does your complaint tell us whether all franchisers require the same arrangement? Does it tell us what the industry standard is? Does it tell us whether they all use outside processors? Does it tell us what the demand is for credit card servicing arrangements? Doesn't it seem like that would be something one would have to tell us if one was going to have a tying arrangement allegation? Honestly, Your Honor, I don't think so, but if the court thinks so, I could be given leave to amend to include there's actually a Nielsen report. How many amendments did you make?  Okay. And I mean, my worry is that it seems to me that since you're so anxious to go to this credit card servicing arrangement that's outside the one you have, that there's nothing to suggest that market is too diluted.  Therefore, there is no tying arrangement I ought to be too worried about. When a lawyer sits down to plead the complaints, I have to look at the elements of the claim and the elements of a tying arrangement as per Jefferson Parish in Northern Pacific talk about in Fortner, talk about you've got to allege two separate products and you've got to allege significant market power and no bright line percentage of the, in this case, franchisor to impose the tying. Here, what I allege is bold-faced big numbers. Over 9,000 gas stations are forced to process credit cards involving billions of dollars of transactions in every year through Equilon at higher prices than what we can get out in the marketplace. But we're not talking about gas stations. We're talking about franchises. Petroleum franchises. Now, when you went into this franchise arrangement, what were you purchasing? The right to sell Shell-branded fuel and Texaco-branded fuel to the motoring public under the trademark. But under a market franchise, you had to enter into a franchise agreement. If you entered into this franchise agreement, you couldn't have the franchise agreement. If you didn't have that, you couldn't sell the gas. And our circuit, as well as other circuits, say that any control by the contract itself cannot constitute market power. So there we are. We have a contract you are entering into in order to get the gas, it's a franchise, and we have this, if you will, case law suggesting that any control due to the contract itself cannot constitute the market power. How do you respond to that? I think that that analysis ignores all the TBA cases, Your Honor. And if you go back to the Lessig v. Tidewater oil case, the way that I structured the complaint was actually after the Ninth Circuit's decision in the Lessig v. Tidewater case, which, as far as I know, is still good law, Your Honor, in this circuit. And it talked about what you need for an unlawful tie. And it talked about market power. It talked about the fact that how much gasoline they sold, how many states they did business in, that they had 2,700 gas station operators, and that they were forced, as a matter of contract, to buy tires, batteries, and accessories from companies chosen by the oil company. I guess that what we have to think about is whether this credit card processing is really a product. Now, is it possible to think of it in terms of management? They wish to make sure that they get their payments from the various gas stations, and they want to be able to credit those receipts against future purchases of gas. This is where I look to the Visa and MasterCard cases that are cited in our briefs, because those cases go into a great detail and analysis about the credit and debit card processing industries. And Walmart was successful in arguing that debit card processing services are separate and distinct from credit card processing. Why is it so much of a leap to say that is debit and both debit and credit card processing is separate from the petroleum franchise? It's just a method of payment. Nothing will change if we change credit card process providers. It might. They'll still get paid, Ron. It might cost you more. No, it costs us less. We've shopped around. You said nothing would change. No, nothing would change except we would pay less for the processing. Now, there's no restriction. There are a whole variety of credit cards that will be accepted. Is that right? Yes. There wouldn't be any change in MasterCard, Visa, American Express, Discover, Diner's Club, WEG. The only difference would be Equilon wouldn't get a kickback. Well... They wouldn't get a piece. And they know they do it. That's part of the franchise price. But credit card and debit card processing services have nothing to do with the franchise. When a customer pulls up, it's up to them whether or not they want to use American Express, Visa, MasterCard, or Cash. Now, if you go to an independent gas station, they have the right to go to their own credit card service provider who does the exact same methodology. Now, the only difference is the money comes from the acquiring bank into the dealer's bank account, which they have access to. Equilon still gets paid. They reach into the bank accounts of the dealers and get that money instead of credit it to the dealers against the next load. That's the only difference. Now, there are some things in the reply brief I just want to touch on. Let me ask you, you're not asking us to send this back on abuse of discretion on motion to amend, are you? You didn't put it in your opening brief. Well, in the last couple of pages in my opening brief, I actually... You never filed an amendment, did you? No, Your Honor. I'd be leery of Rule 11 sanctions in front of Judge Wheeler. And you stipulated the judgment being entered? Only as to the fifth cause of action, which... Which on the first two, when the first two, the answer was never filed as those counts, but there was an answer filed as the remaining count, which was the one we have in front. And my worry is that based on what you've done, I can't really worry about that motion to amend. Tell me why I can, when one doesn't even raise it in his opening brief. He never asked to file an amendment, though it could have been done. Even after the ruling on the motion to dismiss, nobody said anything. And his right to amend entered with the stipulation, with the filing of the answer, entry of the final judgment. And in here, you stipulated the judgment being entered. So I'm trying to figure out how I get to that. With respect to seeking leave to amend, after Judge Reel granted it without any explanation, the motion to dismiss, without any explanation or analysis whatsoever, the only remaining claim was the fifth cause of action. And the order that was entered was without leave to amend. Now, as a lawyer practicing in this district, I can tell you that I'd be very leery to go back in front of Judge Reel to rehash the same arguments for fear of Rule 11 sanctions. So I did not do that, nor did I think it was necessary. However, I did ask for leave to amend in my opposition to the 12B6 motion. We did act for it, and it's in the record. But we didn't put it in our opening brief? Well, it is in my replier brief. Here's my dilemma, Your Honor. They're arguing the law is this. I'm arguing the law is over here. I think before any prudent lawyer can amend, be granted leave to amend, which we did ask for specifically in our opposition to the 12B6 motion, and I touched upon that in my reply brief, that let's assume this Court holds that we're not allowed to pursue the per se, under the per se rule, which I think is available to us, if we can show sufficient market power. Then we should be allowed to amend to pursue under the rule of reason. Why wouldn't one put it in his opening brief so that all the case law doesn't say we can't even think about it, if that's your idea? Well, Your Honor, because honestly, although I did address it in my reply brief, I think that the per se rule of, there's a per se violation here. If we can establish that Eklund Enterprises has sufficient economic power, I think the per se rule applies, and that no amendment is necessary. That's a fact. But if there's going to be a change in the case law that says Jefferson Parish doesn't apply, even though they talk about when you apply per se and when you apply rule of reason, then I want the Court to guide me on what elements are necessary to pursue under the rule of reason in light of the Bell Atlantic case, in light of the Leaping case. I would have liked to have had a chance to do that if somebody would have given me something in his opening brief. I'll waive the right, then, when he didn't. Now, let's just go on. I mean, that's my worry. Isn't it true that this complaint doesn't even list any banks that process these cards for a fee? We don't have that information yet, Your Honor. In the defendant's Rule 26 disclosures, they've admitted that they have agreements with banks. They haven't disclosed who with. We don't know who it's with. We can only guess, because none of our contracts identify the processing banks. And they may have actually changed. So for me to allege who it is, and when they entered an agreement, without actually getting the agreement, which exists, they've acknowledged the existence of an agreement in their Rule 26 disclosures, but have not turned it over. I need that information, Your Honor. Isn't it true also that based on the allegations of your complaint, Equilon wouldn't even be a competitor with these banks? In fact, Equilon only has a contract with each one of these banks who process these cards. And therefore, they're not competitors with them. And therefore, there is no competition elimination by them not being involved in the market. Well, the rub there, Your Honor, is Equilon actually has a proprietary credit card, and we're alleging that they are, and I allege that in my complaint, that they're one of the largest proprietary credit card holders in the industry. They are a competitor. They're competing for credit card transactions with Visa, MasterCard, and American Express. But nothing in what you, nothing the consumer isn't constructed to use their card. Well, it's up to the consumer which card to use, no question. But I would say that as a question of fact, you know, whether or not Equilon is a competitor, if they're out there issuing credit cards, proprietary credit cards to consumers, they are in fact competing with Visa, MasterCard, and American Express. These are facts that are readily available through discovery and trial. So again, what we have is we have, why does, why do the cases in the TBA cases not apply here? Why is that law not good law? There's nothing in the Ligon case, the Belt and Inlet case, or the Illinois tool that does away with standard oil versus U.S. or Lessig versus Tidewater. In fact, it only enhances it. It just does away with the presumption of market power. Once we have the presumption of market power, and once we have rather sufficient market power, we then have an unlawful tie, and it's a per se violation of the Sherman Act. If the other element that we pled, why I didn't plead all the other information that you're talking about in the credit card industry is that all we have to prove is that it's a not insubstantial amount of commerce. That's what we have to prove. I think the allegation that we're dealing with billions of dollars in transactions throughout the United States is enough to put them on notice of what they're up against. Now, I will tell you, Your Honor, if granted leave to amend, and if required to do so, there's the Nielsen survey, and what that does is that information service provides a tremendous amount of detail on the credit card industry, and that information is available to anyone who wants to purchase it. And I'd like to reserve a few moments to respond if necessary. Good morning, Your Honor. It's Brad Phillips on behalf of Defendant Equan. Your Honor, first I'd like to focus very briefly on what this case is about and what this case is not about. First of all, with respect to leave to amend, Your Honor has it precisely right. In fact, the order on the motion to dismiss, which appears, Your Honors, at page 278 of the experts of record, does not say that the motion is granted without leave to amend, and it does not say that the motion is granted with prejudice. Following that order, not denying leave to amend and not with prejudice, plaintiff's counsel made no effort to amend his complaint. Instead, he made the strategic decision, and I'll explain in a moment why I think it's clear he made that strategic decision. He made the strategic decision to ask us to stipulate to judgment, dismissal with prejudice of his remaining claim that we had not moved on, so that he could go up before this Court on this complaint and this complaint alone. And that, Your Honors, is why he did not raise leave to amend in his opening brief, because he had no basis to raise leave to amend in his opening brief. Only after seeing our opposition brief and seeing some new decisions by the U.S. Supreme Court did he then make a argument that he should get leave to amend. But at no point, Your Honor, either in the district court or in this Court, has counsel ever explained how he would amend in a manner that would allow him to proceed with this complaint. So it is clear that that issue is not before this Court. Secondly, Your Honor, I think the reason for that is that this case stands or falls on the per se rule. Because the complaint, the only way plaintiffs could have a claim here is, under the rule of reason at least, is if there were facts alleged showing that there was an anti-competitive effect in the market for credit and debit card processing services. That's the market on both claims, both the tying claim and the vertical price-fixing claim, where you would have to have an anti-competitive effect. And the complaint itself already reveals that no such allegation could be made, because the complaint alleges that there are, in fact, many competitors out there competing to offer better terms and conditions for credit card and debit card processing services. And that's why they think they could get a lower price out in that competitive market if they had not contracted with Equilon to provide those services. So that's why we are where we are, Your Honors, is because this is a per se case or not, and counsel made a strategic decision to litigate that issue in front of this Court. With respect to the issue of a per se claim, I'll start with the easy issue. I think they're both easy, but the absolute easiest issue is with respect to the second claim, which is the second claim for relief and the fourth under state law, I believe, which is the vertical price-fixing claim as between an agreement between Equilon and banks to provide credit card processing services to the plaintiffs with a fee being paid to Equilon for arranging for those services. First, I'd like to say, Your Honors, that this is also a critical fact. That's all part of a package. The plaintiffs get gasoline from Shell, but they also get Shell's trademark, which I think we can probably all recognize and I believe is pleaded in the complaint, is an extraordinarily valuable commodity, not actually a commodity, but extraordinarily valuable piece of business product. The only compensation other than the purchase and sale of Shell's gasoline, the only compensation in the franchise agreement to Shell for giving them, as opposed to someone else, that trademark, are these credit card processing services. And it is also quite disingenuous, I think, and it's certainly not pleaded in the complaint, that these credit card processing services are not a key and critical part of a Shell franchise agreement, as we drive into a gas station. And whether those services are provided or not is a critical component of the Shell offering to its consumers. If consumers came into one of its gas stations with a Shell trademark on it and either paid with a credit card and had some mistake made in the processing of that credit card or weren't allowed to use credit cards or a particular credit card, that would certainly affect the value of the Shell trademark and of the Shell business. That's why it is an integral part of a franchise agreement and not a separate product, as Your Honor, Judge Fletcher suggested, at least with your questioning. And so, and I'm sorry, Your Honors, but so there really isn't a separate product, but on the vertical price-fixing claim, Ligon disposes of that claim with respect to the Per Se case. And I don't think we need to spend more time on that, I hope, unless Your Honors have questions, because they don't have a rule of reason case because the complaint shows that there's no anti-competitive effect in the relevant market. With respect to the tying claim, Your Honors, I would submit, I acknowledge that Your Honors are typically bound, obviously, by the U.S. Supreme Court decisions, but I would submit, Your Honor, that at this point, in light of Illinois Tool Works, which expressly states, Your Honors, that, I'm sorry, expressly states that many tying arrangements are fully consistent with a free competitive market. In light of that decision in 2006 and the Ligon decision in late 2006, which says that resort to Per Se rules is confined to restraints that would always or almost always tend to restrict competition and decrease output, and that to justify a Per Se prohibition, a restraint must have manifestly anti-competitive effects and lack any redeeming virtue. Your Honors, the statement in Illinois Tool Works that many tying arrangements are fully consistent with a competitive market cannot be reconciled, I don't believe, with the statement in Ligon about when Per Se rules apply, other than by saying that a tying arrangement is not subject to a Per Se rule. I would invite Your Honors to consider that issue in light of those two very recent decisions by the Supreme Court. But regardless, you don't need to reach that issue in order to rule firm the dismissal below here, because it is clear that Plaintiff has not pleaded market power on the part of Pequodon. There is no allegation contrary to counsel's suggestion in his argument. There is no allegation in the complaint that Shell is the number one franchisor. There is an allegation that they are the number one retail seller of gasoline in some markets. Even if there were an allegation that they were number one, that would not be sufficient to suggest market power, because as the complaint reveals, 13% is the number for gasoline sales, and that is clearly, as a matter of law, I would suggest, not sufficient to show market power. In addition, Your Honors, the allegation that there are many competitors in the credit card processing services market offering better terms and conditions, that that market is in fact competitive, that allegation itself implies that Equilon, and for that matter no one else perhaps, has or is exercising market power with respect to that market, because the market is in fact fully competitive. So there is no allegation of market power. We submit that there could be no such allegation. In addition, there is no sufficient allegation of two separate products as opposed to a single unified franchise agreement. And in addition, Your Honors, and this is crucial in terms of the equities, if you will, perhaps, there is no allegation that what they are paying for a shell franchise is not a competitive price. They allege that they think they're paying more for the credit card processing services than they might be able to get if they were just out there buying that by itself. But there's no allegation that what they're paying for a shell franchise is super competitive, that given what they have to pay for the gasoline that they receive and given the value of the shell trademark, that the overall cost of the franchise agreement is not a competitive price. And the case law is quite clear, Your Honors. We've cited United Farmers and Cherokee Aviation, that in a tying case, the plaintiff must allege that the cost to it, the combined cost to it of the tying and tied product is super competitive and more than they would otherwise pay. And there is no such allegation here, Your Honor. So for all of those reasons, the claim, the price fixing, I mean, excuse me, Your Honors, the tying claim fails, as does the vertical price fixing claim. Unless Your Honors have questions, I would submit. Thank you. Thank you, Your Honors. Thank you, Your Honor. Briefly, I would ask the Court to nulch the appellant and please read the complaint one last time, because we believe and we're going to argue to this Court that there's enough in there to make out a case, a prima facie case, the elements of unlawful tying and that this is, in fact, a per se case, if it can be demonstrated as a matter of fact that there's the appellant's economic, sufficient economic power to impose the tie to warrant per se treatment under Jefferson Parish and Fortner and the related cases. You're saying that if there were no tie-in, that each station would be able to contract with somebody else? As a matter of fact, Your Honor. And that each could pick somebody, there wouldn't be any uniformity? I'll give you an example. There's a company called First Data that works with the National Association of Convenience Stores. They offer the exact same processing services to the exact same internet and computer technologies and fraud prevention. There would be a seamless transition to another company providing these services. Virtually all retailers accept credit cards and debit cards for payments today. This is a service that's readily available and as far as it being a separate product, again, Your Honor, if you're not a branded gas station, you can get the same service from somebody else. It has nothing to do with this. That doesn't say it isn't a separate product. That says it is the same because that was the counsel's argument. We want, in our particular franchise agreement, certain things that are done in order to make it ours and make it the way we want it for our franchise. And therefore, if there is another idea out there, outside of what we do, fine, go find them. But what we want in our contract is this. And therefore, he built, that was his argument, he built as to why it is a contract on which it is not separate. It's a part of what we offer as a franchise. But isn't that a question of fact, whether or not it's a separate product? Is this something that the court can rule as a matter of law? Whether or not it's an essential part of the franchise relationship, is that a question of fact like the tires case? Why not force us to buy shell tires? Why not force us to buy shell batteries as part of that? Why not force us to buy shell accessories? It's part of our trademarks. It's all underneath it. Well, the courts have already held that it's a separate product. And that's really no different from credit and debit card processing. It's just a service, and if you look at the Waffle House case, Midwestern Waffle versus Waffle House, vendors who provide services are not an integral part of the franchise system. And that case is cited in our briefs as well. Thank you so much. Thank you very much. Case 0655937 is hereby submitted. Thanks, counsel, for your argument. I think that adjourns us for today. All rise. Where did I do it? Thank you.
judges: Fletcher, Smith, King